Mr. Hannafin. Good morning and may it please the Court. Sean Hannafin on behalf of the Title Industry Assurance Company Risk Retention Group, which in the interest of brevity I'll refer to as TYAC. Your Honors, in the Court below, the Court recognized four distinct reasons why the TYAC policy did not apply or provide coverage for the conduct and action. The dishonesty exclusion applied, the exclusion for defalcation applied, the insured had knowledge of the Ponzi scheme and criminal acts prior to inception of the policy, and the insured misrepresented its answers on the application for the policy. Despite those four findings, the Court declined to enforce any of those policy provisions, and principally for two reasons which I'll address. The first was the Court suggested that there were what it characterized as other theories or alternative proximate causes for the injuries that were complained of, and the Court was wrong with respect to that in at least three respects. One, the Court got the substance of Illinois law wrong with respect to that. Two, the Court failed to apply all the relevant provisions of the insurance policy, and third, the Court simply got the facts wrong on the record that was before the Court. With respect to the substance of Illinois law, the Illinois Supreme Court's decision in Northbrook and this Court's decision in Nautilus both provide that when a claim involves both excluded causes of action, as this claim concededly did, the theft of the escrow funds, and also other causes of action, the other causes of action are not sufficient to preserve coverage unless they're wholly independent of the excluded causes of action. So what happens if the plaintiff alleges both covered and uncovered conduct, for example, depends on the state of the insurance? How do you determine whether it's covered when a complaint has been filed? Well, you look at the conduct that was alleged here, Your Honor, and it's important to note that in, for example, Coastal Funding's complaint, they allege two causes of action. One, misappropriation, and the second, conversion. The Court says- I thought they alleged breach of contract. Not in the first, excuse me, not in the first iteration of their complaint, Your Honor. Maybe in their first amended complaint? I believe it's the third amended complaint before we get there, Your Honor. But with respect to the original complaint- Who cares? By the time you declined to indemnify and agreed to defend under a reservation of rights, we were at the fourth amended complaint. That's correct, Your Honor. So presumably your decision has to be measured against the fourth amended complaint. Your Honor, I don't think that's correct. Actually, I'd like to pursue your original decision to deny a defense, because it seems to me under Illinois law, that's really the pivotal issue here. Because I understand you offered a defense in 2014 on at least one of these cases, but I think we need to go back to the 2009 letters by Mr., is it Catan, denying coverage? That's correct, Your Honor. They didn't seem to address the question of a duty to defend at all. The letters declined coverage with respect to both defense and indemnity, Your Honor. Without, without, and I mean, look, I think I totally understand your point that you may well have good policy defenses to indemnification if they're still available to you. And that's why I'd like to focus on your decision to deny coverage in 2000, due to deny a defense in 2009, because I don't understand how you could determine on the face of the complaints alone, that there was not even any potential for a covered claim here. Well, I think you can do that, Your Honor, by reviewing the complaints. And it is, of course, clear that the exclusions at issue apply to the duty to defend, as well as the duty to indemnify. The coastal funding complaint asserted two causes of action against the Chicago abstract defendants. The first one was breach of fiduciary duty. But it is expressly breach of fiduciary duty by misappropriating funds. That's the precise language of the complaint. So to the extent that that's a breach of fiduciary duty claim, it's expressly linked to- There are a lot of other allegations in those complaints, right? Not in the first- Failure to pay, failure to comply with industry standards, negligence with respect to the escrows. There's a lot of other stuff. I certainly understand there are allegations that you can say, well, if that's what's proved, they're out. There's no coverage. We don't know a duty to defend at all. But there are a lot of other allegations as well. So how do you determine from the face of that complaint, we're off the hook from a duty to defend? Your Honor, because the allegations you're referring to didn't appear in those complaints in 2009. Those are allegations that first started appearing in the third amended complaint, their fourth attempt. And the negligence supervision claim first appeared in the fourth amended complaint, which was filed in 2014. If you look at Coastal Funding's initial complaint, Your Honor, it uses the words- Look, tell me where to find which complaint because these things have been shifting. Your Honor, in the separate appendix, the Coastal suit commences at page 70. Seven, okay. Hang on just a second. Yeah, okay. Common law fiduciary duties, statutory duties, and so on, right? And if you look at the two counts that are pleaded, Your Honor, at page 72, Coastal alleges that the fiduciary duty was breached by misappropriating its funds. Right, but it's alleging conversion. Does conversion require some kind of criminal intent? We believe it does, Your Honor. And we believe it's not required in this circumstance, Your Honor. We don't believe that criminal intent is required to trigger the exclusion. I thought conversion was a tort, and it was a no-fault tort. I'm sorry, Your Honor. Perhaps I misspoke in response to the court's question. You were asked if conversion required criminal intent. No. You said yes. I'm sorry, Your Honor. What I meant to say was it does not require that. But criminal intent was plainly present here given what occurred and given the subsequent guilty plea of Mr. Orozco. I apologize. So in 2009, all you have alleged, at least you have a claim on which Coastal could prevail simply by showing a mistaken exercise of control over its money, right? Your Honor, that's in the context of a complaint in which they specifically allege that the monies were intentionally stolen. Of course they allege a lot. They allege the waterfront, right? From strict liability and negligence up to fraud and criminal wrongdoing, right? They do not at that time, Your Honor. In fact, if you examine that complaint. I'm saying that's within the scope of those allegations. They are not as explicit as they might be. The word negligence nowhere appears in that complaint, Your Honor. The words Ponzi scheme. How about is negligent conversion possible? Is that a possible tort? I'm not certain of the answer to that, Your Honor. It is. Since you don't have to have any state of mind relevant to it. If you just exercise control over somebody's property mistakenly thinking it's your own, you've committed conversion. Well, and it's just carelessness. And if you have, Your Honor, you fall within the scope of Exclusion J, which deals with the failure to return funds or failure to pay or return funds that have been entrusted to you. So once you are... Does J apply to negligent mistakes? Yes, it does, Your Honor. It applies to any failure. I thought this was basically an errors and omissions policy, right? It is, Your Honor. So I would think that errors... It doesn't cover errors. That's correct, Your Honor. Are you kidding? It's an omissions policy. Seriously? I mean, negligent mistakes aren't covered by an errors and omissions policy? Yes, they are, Your Honor. But retention of someone's funds falls within the scope of an exclusion policy. If it's a mistake? Even if it's a mistake, Your Honor. Do your insureds understand this? I believe they do, Your Honor. Our insureds own the company. The insureds are approximately 1,100 title insurance agents who operate title insurance businesses, and they expect coverage in the event that they make errors. They don't expect coverage in the event that they retain someone's funds wrongfully. Let's see. What about the other complaint? Your Honor, the first American complaint actually predated the coastal funding complaint. And that complaint expressly asserts that the funds were commingled and expressly asserts that the funds were misappropriated. Failing to properly account, failing to prepare and maintain records... Yeah, okay. Your Honor, with respect to the failure to properly maintain records and failure to account, that's what falls within the scope of the Northbrook and Nautilus decisions, which require that there be a separate compensable injury as a result of those failures. This was a Ponzi scheme, and any Ponzi scheme, in addition to the theft of the funds, is going to require some mishandling of the documents or the records with respect to the transactions. That's a point that the Eighth Circuit expressly recognized in the Bethel decision. There is no injury to either First American or Coastal as a result of any of these alleged documentation errors. The injury to them arises out of the fact that the funds were stolen. Let me try to get at this a different way, Counsel. In as of the February 2009 tender, how could you guys tell whether Mr. Orozco was a dupe or a criminal? As of the time of the tender, Your Honor, I think we could not tell for sure whether he was. What we did know was that several million dollars, at least allegedly in excess of two million dollars, had been paid to Chicago Abstract and that those funds had gone missing. Right, but surely it makes a difference under your errors and omissions policy whether that was intentional criminal wrongdoing by the insured or negligent folly, right? That's true, Your Honor. Respectfully, I'd suggest that when the claims that are asserted and the documentation that's provided to the insurer says the funds have been misappropriated and the insured has already met with the FBI with respect to this problem, that's suggestive of something other than negligence. Suggestive, absolutely. But I don't understand how you decide definitively in the summer of 2009 there can't possibly be any covered loss here. Well, I think when we compare the allegations of those two complaints to the terms of the policy, there is no potential for covered loss there, Your Honor. Could you address the employers against Elko case? Yes, Your Honor. Which the other parties rely on heavily. Your attempt to distinguish it in your reply brief, frankly, seems to misread it. I'm sorry, Your Honor. Seems to misread it. Well, we don't believe it misreads it, Your Honor, because the prong of Elko that we rely upon is the prong that says if your coverage decision is correct and you're not in breach of the duty to defend, the stopple doesn't apply. Well, the question is whether you breached your duty to defend. And that goes back to the questions I've been asking you about how you determined definitively in 2009 no possibility of coverage here. Yes, Your Honor, I understand that. And, Your Honor, we believe when you compare the allegations in the complaint to the terms of the policy, there is no coverage for those complaints as stated. And I think what demonstrates that, Your Honor, is the subsequent conduct of the claimants. They tender. We decline coverage. They amend twice. The amended complaints aren't even tendered to TYAC. And then- Is there an obligation on the part of the insured to keep appealing to you all? I don't think there's an obligation to continue to appeal to us, Your Honor. But if they think that the new complaint brings them within the scope of coverage, then they should tender it to us. And it's important to note here, Your Honor, that the insured never objected in any way to our coverage determination. And this isn't an insurance company dealing with a homeowner. This is an insurance company dealing with a professional services firm that not only was represented by counsel, but had a receiver appointed. And neither one of them objected in any way in the course of discussions with them that are reflected in one of the two coverage letters or in response to these positions. In fact, when the third amended complaint was received by us, it was received by us directly from the claimants. We had had no further communication from the insureds with respect to this. And we'd submit further, Your Honor, the fact that the insureds didn't in any way contest the declaratory judgment action suggested that they didn't have any difficulty or dispute with respect to the coverage position that Tyak set forth. So who is it? Well, the insureds presumably are out of this, right? Yes, they are, Your Honor. I mean, as a practical matter, this case is between you and the underlying claimants, right? It is, Your Honor. So why should we draw many inferences from the actions of the insureds who had bigger problems on their hands? Well, I think, Your Honor, it simply confirms what we knew from the period of inaction following the discussions and issuance of coverage correspondence in 2009 that they didn't dispute our coverage position. And I think that's something that the district court overlooked. When we engage in discussions with our insured and come to a conclusion that there isn't any coverage, we talk with them, we write them, we ask them expressly in both of our letters to contact us if there's any additional information they'd like us to consider. We think that there's no dispute, and that's among the reasons why there would have been no reason or expectation that anyone should file a declaratory judgment action in 2009. We weren't aware. In fact, we were never aware until after the Fourth Amendment complaint was filed that there was any suggestion that there might be coverage under the policy. And if you look at the complaints, Your Honor, the first complaint says they stole our money. The second complaint says they stole our money. They don't even bother to send it to us. The third one says they stole our money. They don't even bother to send it to us. Then Orozco gets charged criminally, at which point the claimant presumably takes a look at that and says, that's probably bad for my attempt to pursue coverage under an errors of omissions policy for criminal conduct. So they amend their complaint, and at that point, they add negligence counts. Then Orozco pleads and testifies against his confederates who are convicted, at which point they file a Fourth Amendment complaint, and they now say we're going to add a negligent supervision claim. When we get to the district court on our coverage action, the district court takes us to task for not defending in 2009 and says, well, there was a negligent supervision claim. That negligent supervision claim wasn't asserted until 2014, and it was asserted in 2014 plainly in an effort to get around the coverage positions or the provisions of the policy that we've been relying upon. So if that had been asserted in 2009, would you have had a duty to defend? I don't think we would have had a duty to defend, Your Honor, but I think there's some likelihood we would have, out of an abundance of caution. We've elected to defend and file a declaratory. Yeah, defend, reserve your rights, seek a declaratory judgment at the time, right? And then you protect your interests under Illinois law. And if the 2014 complaint had been what had been filed initially, that may well have been what we would have done, Your Honor. But the simple fact of the matter is the 2014 complaint, which attempts to include negligence allegations, is filed subsequent to the charging and the guilty plea of the individual who was involved. There wasn't any negligent conduct on his part. There was criminal conduct on his part. The other issue I'd like to address is the court's, the district court's, declination to enforce the policy's prior knowledge and application misrepresentation provisions, each of which the court found sufficient to avoid coverage here if they were to be applied. Was that provision flagged as a reason for declining coverage or defense in the letters? It wasn't in the initial letters, Your Honor, but you have to bear in mind the time frame. No, we have to apply Illinois law. And as I understand Illinois law, any theory of non-coverage that is not asserted in letters sent to the person seeking defense and coverage is forfeited. Your Honor, it has to be a theory known or reasonably knowable by the insurer. What Illinois case law do you rely on for that proposition? As I sit here, Your Honor, I don't have a case in mind. Well, that's a big problem. The Illinois cases appear to be definitive. They say, if you don't assert it in those communications, then it's forfeited. You say, okay, there should be some exception. We're a federal court. We can't make exceptions to state rules. We can apply state rules. So if there's a basis in the state decisions for this exception, that's fine. That's why I'm asking you, where should we look in the state decisions for this exception you're asserting? I don't know, Your Honor. Respectfully, I've submitted it. We've got a problem under Erie, then, because we can't change state law. I don't think it's an exception, Your Honor. I think when an insurer reviews the terms of a complaint against its policy, it has to deal with what's in the documents that are in front of it. That's a fine policy argument, and maybe you'd persuade the courts of Illinois. But you chose to file this action in federal court. Yes, Your Honor. And here we are. Yes, Your Honor. Your Honor, I'd like to reserve the balance of my time for rebuttal. Your balance of time is probably about 30 seconds. Thank you, Your Honor. Thank you, Mr. Hannafin. Mr. Wentz. Morning, Your Honors. May it please the court. My name is David Wentzel, and I represent Coastal Funding on this appeal. The district court in this case correctly determined that the underlying complaints triggered the insurer's duty to defend, that the insurer breached its duty to defend because it took no action either to defend the insured under a reservation of rights or to timely seek a declaratory judgment action for five years from the date of the tender of the underlying complaints. And the district court properly determined that as a result of that breach of the duty to defend, TYAC is now stopped from asserting non-coverage. Because these determinations were correct, this court should affirm the district court's ruling. Now, the duty to defend analysis is governed by familiar and straightforward legal principles of Illinois law. Number one, the duty is determined based on what is alleged in the underlying complaints, not what is ultimately proved. The insurer cannot simply refuse to defend, sit back, and wait to see what is ultimately proved. And if what's ultimately proved shows that there's no coverage,  Number two, if the conduct alleged against the insured in the underlying complaints states a claim or a potential claim within coverage, then the duty to defend is triggered regardless of the label placed on their conduct by the pleader. Three, refusal to defend is unjustifiable unless it is clear and without doubt from the face of underlying complaints that the facts alleged do not potentially fall within coverage. As this court held in Cincinnati Insurance Company versus Eastern Atlantic Insurance Company, allegations of excluded conduct do not take the claim out of the policy if those allegations are not essential to a potentially covered claim. And as this court recently held in the Artisan and Truckers Casualty Company case, it doesn't matter if some theories of recovery in the complaint against some defendants are excluded because the plaintiff may recover under multiple theories of recovery against different defendants. And if any of them are potentially within coverage, then the duty to defend is triggered and the insurer who fails to defend does so at its peril. Now, in this case, the underlying complaints from the very beginning alleged facts that stated claims that were potentially within coverage. The first funding complaint, remember, these were all filed around the same time and they all arise out of the same circumstances of what was occurring at Chicago Abstract Title Agency. In fact, the coverage letters that TIOC sent to the insured described them as similar complaints or related complaints. The first funding complaint, which was one of the lenders similarly situated to coastal funding, did not contain a single allegation of excluded conduct. It alleged claims for breach of contract relating to escrow transactions, breach of fiduciary duty related to the failure to safeguard escrow funds, and negligence in negligently accounting for escrow funds that were entrusted to it, negligently closing or failing to close real estate transactions for which the funds were deposited, negligently maintaining its escrow account, and negligently dispersing funds contrary to the escrow instructions. None of those claims requires proof of any excluded conduct. Similarly, First American alleged in its very first complaint that Chicago Abstract neglected to supervise or oversee the title and escrow activities of its agents, employees, and representatives. That's in paragraph 14 of its complaint. In paragraph 23, First American alleged that funds, that they wrongfully held themselves out to the public as an agent of First American with regard to the disbursement of escrow funds. It also alleged breach of contract relating to escrow funds, including causing escrow shortages. It had to be clear from the face of these complaints that there were no potentially covered claims in order for the insurer to justifiably refuse to defend. What do you make of Exclusion J, which seems awfully broad? But the exclusion is framed in terms of the claim. The language of Exclusion J says that this policy does not apply to any claim based upon or directly or indirectly arising out of or relating in any way to any defalcation, commingling, or failure to pay any funds. It has to be a claim that's based upon or relates to defalcation, which is embezzlement, or a failure to pay funds, or commingling. In other words, the legal theory- How about just, you owe us money from the escrow after this closing. Give it over. We can't. Is that an excluded event? Not at all. That's not an embezzlement. You don't have to prove embezzlement. It's a failure to pay, isn't it? No, a failure to pay in the context of an escrow agent refers to the escrow activity of paying off liens and mortgages and encumbrances prior to the transfer of title. At a closing- Where in the policy does it say that? The policy doesn't say that. The policy only says the failure to pay. Right. But it's an errors and omissions policy related to escrow agents and closing agents. And so one of the things that's alleged in the underlying complaints is that closing and escrow agents, as a regular part of their activities, have to pay off, pay third parties from escrow funds, liens and encumbrances before the title to the property is transferred. And that phrase has to be interpreted strictly in accordance with its terms. It cannot be expanded under Illinois law. An exclusion cannot be expanded by interpreting it in a way that expands the coverage of the exclusion. Failure to return funds is not the same as a failure to pay funds. And failure- Really? Yes. And failure to- Failure to pay any funds. Your dictionary and mine must be very distinct. I- Well, it's certainly reasonable to read the failure to pay as referring to the escrow agent's failure to pay third parties to- I have no doubt it applies to them. But failure to pay any funds just looks pretty broad. Why wouldn't that apply to money that a title closing agent is holding in escrow? Because it's not clear and unambiguous that that's what it does. That's in distinction to the Bethel case. The Bethel case also involves a title insurance agent. But the policy exclusion in that case, the customer funds exclusion, which is the equivalent of exclusion J, expressly encompassed, quote, loss, misuse, shortage, improper use, and failure to segregate or safeguard. There, it is crystal clear that any loss or shortage or misuse or failure to safeguard is excluded. But the TEOC policy does not go so far. All it excludes is the failure to pay funds. And that's not the same as a failure to segregate or failure to safeguard. The claims in the underlying complaints allege that they dispersed funds. They did pay funds, contrary to the escrow instructions. That's not a claim that's based on the failure to pay. It's a claim based on the fact that they did pay. But they did it negligently or without requiring that the conditions for the escrow were satisfied. And so there are multiple claims that are alleged outside of the failure to pay. Could I just ask you quickly, Mr. Wessel, about this notion about you all have argued in your brief that the insurer has to plead all of its defenses to coverage in the complaint. Or the coverage letters, yes. As a matter, well, I'm focusing in particular on the complaint here. Because that seems to pose its own kind of eerie problem for us. When we're in federal court, a rule about pleadings seems like it would be a federal procedural rule. I think that what's at issue here is the unfairness of raising an argument. I get that completely. But the question, it's the flip side of the question that we ask counsel for the insurer. Well, the Supreme Court has said pretty firmly that federal pleading rules apply under ERIE. Yes. But that's all there is to it. But the principle of Illinois law. Illinois law does not control the content of pleadings in federal court. It controls the consequences of omitting things from coverage letters to clients. But I don't see how Illinois, even if it wanted to, could control the contents of pleadings in federal court. That was probably inartful phraseology. No, I mean, the Illinois case says it. There's no question. It says it. It's just that we can't follow it. I think that was all of my allotted time. Thank you, Mr. Wessel. Ms. Letierre. Good morning. I am counsel for First American. And to pick up where Mr. Wessel left off on the federal procedure in terms of what's required to be in the initial pleadings, I think this goes to the failure of TIAC to plead the prior knowledge defense. And the district court cited the Anderson versus Donahue and a few other Seventh Circuit... There are a bunch of problems in the district court's treatment of that. The district court said that he's granting judgment to your client in part because the complaint fails to plead law. I'm interested in what federal rule or doctrine you think requires a complaint to plead law. I'm sorry, Your Honor. I was not focusing on that part of the... You are now. ...the issues. I don't have an authority that says that they are required to plead law. No, the district court didn't cite anything, and he contradicted the Supreme Court of the United States, which nine to nothing when they had nine justices. They said complaints don't have to plead law. So the question for you is, what do we do with a district court decision that seems to be unambiguously premised on a clearly incorrect statement of federal pleading law? Well, the district court also states that the complaints plead multiple causes of action, some of which fall outside of the excluded conduct. You're talking about the state court complaints. Correct, Your Honor. Not the federal declaratory judgment. Correct, Your Honor. Which is what we were asking about. That's what I was talking about. The district court said the insurer loses his declaratory judgment action because his complaint doesn't plead law, and it can't first introduce these legal theories at summary judgment. Well, the Supreme Court has held otherwise. So we have my question, which is, what do we do when the district court's decision is based quite explicitly on an obviously incorrect proposition of federal pleading law? Well, the review of this court is de novo, Your Honor, and looking at the record and going back to Illinois law and the basic principles, which are not disputed here, is that the analysis pertains to the underlying actions and the complaints filed in state court, and looking at those pleadings to see if there were causes of action that were potentially covered. And I think that gets this court around now. Your suggestion is we just throw the district court's opinion out and decide it all ourselves? I don't think you have to throw the district court's opinion out. I think the district court gives an analysis which pertains to the underlying actions and the causes of action that are covered, potentially covered there, which is why Teoff breached its duty to defend and how the district court came to that conclusion. And that is what is at issue here, is the district court's decision in that regard. And so looking at the underlying complaints, it's been well established that there are a multitude of claims that are pleaded and which fall outside of excluded conduct and are potentially covered. Well, let me just share my impression is that these original complaints all look to me like they were filed in a big hurry, right? It's a crisis, right? Money's missing. You don't know what's going to happen to the records. You're looking for help from the courts as fast as you can, right? Yes, Your Honor. And it's a little thin on theory, which is in essence why I have trouble understanding how one could decide so definitively early on that nothing could possibly be covered. From your perspective, First American's original complaint, what's the best theory or set of theories for covered errors and omissions? The failure of CADAA, Chicago Abstract, to perform in accordance with the agency agreement, which included, as Your Honor highlighted, the failure to keep accurate files, the failure to keep accurate accounting, the failure to, or the improper issuance of title insurance policies, a gamut of actions and conduct that they took or didn't take in fulfilling their obligations as a title agent of First American. And in fact, as Your Honor, to your point, the fact that the complaint is a little bit thin does give cause of concern as to why TEOC did not, out of an abundance of caution, defend. And as counsel said, that relying focus, or I'm sorry, focusing mostly on the Fourth Amendment complaint of coastal funding and this negligent supervision cause of action, First American pleads negligent supervision in its opening complaint in the fall of 2008, and TEOC nonetheless denied coverage for the claims asserted in that cause of action. So to stand here today and say that they may have, out of an abundance of caution, undertook the defense, had it been pleaded up front, is specious. Is that at best, because- Paragraph 14, among other things, neglecting to supervise or oversee the title and escrow activities of Chicago's agents, employees- Yes, that's the paragraph I'm referring to, Your Honor. And then looking at the breach of contract claim that First American pleaded, even in the wherefore paragraph, the prayer for relief, First American prays for a judgment for all of its losses. Another mistake that TEOC makes here is that it wants to focus on the duty to indemnify and just look over its duty to defend here. And I think as Your Honor pointed out, the duty to indemnify may very well not have come into play once we got to trial or once matters were proven, but the duty to defend is much broader and the complaint is broad and there are certainly allegations of conduct which would fall within the scope of their duty to defend in these underlying litigation. Another issue that comes up in the briefs is this June 2009 letter that First American had sent to CATA and which was forwarded on to TEOC. And TEOC seems to place a good amount of reliance on that letter in furthering its justification for not defending, but that letter in addition, or like the complaint the First American filed, does not strictly relate to any conduct in which funds were misappropriated or commingled. It skips over at least two points raised in that letter which highlight that documents were not recorded. And one other, I'm sorry, in that closing transactions when the seller was not vested with title creating title issues, which is of utmost importance to First American because it is issuing policies ensuring title and if CATA is not clearing title in the seller's first, that opens up a whole other avenue of loss to First American far outside the scope of any misappropriation of funds. If anything, that letter should have caused them to revisit First American's complaint and say the losses certainly could be outside the scope of any kind of misappropriation here. That they did not do. What do you make of the fact that the insurer denied coverage and then had just radio silence for years from the insureds? Well, as you pointed out, Your Honor, the insureds were grappling under very stressful circumstances. I'm speculating. You know the case better than I do. Well, I think that's a fair assessment. I don't represent the insured's CATA, obviously, so I can't speak to what was going on in their heads, but the circumstances certainly lent themselves to cause them to check out. Their business was being shut down. First American had a receiver appointed, was bearing the expense of any ongoing operations or winding down of that company. They were facing the prospect at some point much later of a criminal investigation and looking to their own personal salvation and focusing on that. What incentive did they have to really press this issue with TEOC and these underlying complaints? I take it the principals, Mr., is it Kahns and... Knapp. Knapp, basically their equity was wiped out in all this? Yes. So what we're talking about here is just between your clients and the insurance company. Correct, Your Honor. But in any event, while that does maybe raise an eyebrow, the reality is that it was TEOC's obligation to either defend under a reservation of rights or bring its declaratory judgment action. The fact that it put its faith in radio silence then brings us to the third prong under ECHLO that they face the risk of their inaction and that's where we're at today. And so I don't make much of it really because I think that TEOC had the burden to follow through on its obligations as the insurer and bring the declaratory judgment action that it waited five years to bring in hopes that maybe nobody would say anything. In terms of Exclusion J, just one additional point. I think the case of Bethel, which is cited by TEOC, is a good example of what this case is not. These complaints do not allege that the negligence was in furtherance of any alleged or perceived fraud. And in Bethel, there were specific allegations in that regard. Here, we do not have that. My time is up and I ask that you please affirm the District Court's ruling. Thank you. Thank you, Counsel. Anything further, Mr. Hennepin? Your Honor, both First American and Coastal Funding focus on the negligence supervision issues and in response to an earlier question, I acknowledge that out of an abundance of caution, TEOC might have sought to defend at that point. But to be clear, we don't think that the negligence supervision allegations are sufficient to trigger coverage here under Northbrook, which expressly rejected a triggering of coverage based upon negligence supervision allegations, or under this Court's decision in Nautilus. With respect to the alternative theories that are being mentioned here, refusing to apply the exclusions in the context of those alternative theories reads out the portion of the exclusions that appears in bold text, all caps, as the District Court recites it in its opinion. Thank you, Counsel. Sorry? Thank you, Your Honor. We respectfully request that the Court revoke that amendment. The case will be taken under advisement.